Receipt # 000148

ORIGINAL

FILED
JUL 7 2004
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ECF

ZIP-O-LOG MILLS, INC., dba
ZIP-O TIMBER CO.

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 04-1123C

## COMPLAINT

Facts common to all counts

1. This is a federal timber contract case, and this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491 and 41 U.S.C. § 609.

2. Plaintiff is Zip-O-Log Mills, Inc., dba Zip-O Timber Co. ("Zip-O").

3. Defendant is the United States of America acting through the United States Forest Service, Department of Agriculture (the "Forest Service").

4. The Clark timber sale involves the sale and harvest of certain timber located in the Willamette National Forest in Oregon.

5. Bidding for the Clark timber sale contract took place on March 11, 1998.

6. The Clark timber sale contract was awarded to Zip-O by the Forest Service on March 16, 1998.

7. The sale as awarded to Zip-O contained the following estimated volume of sawlogs: 4510 MBF of Douglas Fir, 1142 MBF of Western Hemlock and other species and the following estimated volume of non-sawlog material: 287 MBF of Douglas Fir and 78 MBF of Western Hemlock and other species.

8. The approximate age of the timber on the sale was 200-300 years.

9. As set forth in the prospectus, the sale contained a substantial amount of high grade timber, i.e., 94% of the Douglas Fir was 2S, 3S, 2P, 3P or SP while 93% of the Western Hemlock was 1S, 2S or 3S.

10. The timber on the sale was contained in 11 separate payment units and was sold on a flat rate, tree measurement basis.

11. Pursuant to the terms of the Clark timber sale contract, the Purchaser of the sale was required to perform certain road construction and reconstruction prior to October 31, 1998.

12. The Purchaser would have been able to earn Purchaser Road Credits for performing this road work and use that credit to pay for timber removed from this sale or any other sale in the Willamette National Forest.

13. The prospectus and the sample contract for the sale indicated that the location of areas of the sale needing special protection for plants or animals listed as threatened or endangered under the Endangered Species Act of 1973, or as sensitive by the Regional Forester under FSM 2670, were shown on the Sale Area Map, identified on the ground and listed in the contract. No such areas were indicated in the contract documents.

14. Clause C6.25 of the sample contract expressly indicated that measures needed to protect such areas were: "N/A."

15. Zip-O reasonably believed that the Forest Service had adequately taken measures to protect sensitive species (which, at the time that the sale was sold, included the Upper Willamette Spring Chinook salmon) when the Forest Service designed the sale.

16. In formulating its bid, Zip-O reasonably relied on the Forest Service's representation in C6.25 that there were no areas on the sale requiring special measures to protect any sensitive species – including the Upper Willamette Spring Chinook salmon, which unbeknownst to Zip-O at the time, had been proposed for listing as a threatened species on March 9, 1998.

17. The Normal Operating Season for the sale was May 1 to October 31. The original completion date was March 31, 2001. The original overall length of the sale was 36 1/2 months (18 months of which were within the normal operating season.)

18. After award of the contract, Zip-O constructed all of the specified roads on the sale by the required completion date October 31, 1998 and earned a total of $ 368,870.46 in Purchaser Road Credit and removed a small amount of timber (139 MBF of Douglas Fir sawlogs and 7 MBF of Western Hemlock sawlogs from Units 1, 34 and 35).

19. As of the start of the 1999 operating season the following volume of sawlogs remained on the sale: Douglas Fir- 4371 MBF, Western Hemlock - 1135 MBF.

20. In early May 1999, Zip-O advised the Forest Service of its intention to remove all of the remaining timber on the sale in 1999.

21. However, shortly thereafter, on May 19, 1999, the Forest Service suspended performance on the sale because of the need to submit the Clark sale for consultation to the National Marine Fisheries Service ("NMFS") due to its potential effect on the Upper Willamette Spring Chinook salmon which was listed as a threatened species effective May 24, 1999.

22. A single Biological Assessment on this and the Lois timber sale was submitted to NMFS for formal consultation on July 30, 1999.

23. Formal consultation was necessary because the Forest Service's Level 1 team that had reviewed the project agreed that a Likely to Adversely Affect determination was necessary due to the road work requirements on the Lois timber sale.

24. Consultation should have been completed within 90 days and NMFS should have issued its Biological Opinion within 45 days thereafter, i.e., the process should have been completed by December 12, 1999 (well before the start of the 2000 operating season).

25. Because it had received no Biological Opinion from NMFS, the Forest Service decided to split the Clark sale from the Lois sale and to review it separately after it had waited for the outcome of an October 18, 1999 appeal in the case of Pacific Coast Federation of Fisherman's Association v. NMFS at the Ninth Circuit.

26. The Forest Service's Level 1 team agreed that performance of the Clark timber sale was not likely to adversely affect the species, and submitted a Biological Assessment so stating to NMFS for informal consultation on August 15, 2000. NMFS then issued a letter of concurrence on September 27, 2000, and the suspension was lifted thereafter, after having been in place for 497 days i.e. more than 16 months.

27. On or about August 31, 1999, the Forest Service also suspended performance on Clark until an injunction issued by U.S. District Court Judge Dwyer was no longer in effect.

28. As of the date of this complaint , over four ½ years later, the Forest Service has never advised Zip-O that performance of the sale as originally bid could resume.

**The Northwest Forest Plan**

29. Rulings against the Forest Service, the Bureau of Land Management ("BLM"), and other agencies in the early 1990s led to a joint effort by the Forest Service and BLM to develop a management plan -- the Northwest Forest Plan -- for national forests and BLM districts within the range of the Northern Spotted Owl.

30. The Forest Service and BLM's interpretation of part of this Plan had the effect of exempting numerous proposed sales from various rare wildlife and plant survey requirements contained in the Plan.

31. Several environmental groups challenged this interpretation arguing that the agencies violated the Northwest Forest Plan by authorizing timber sales without conducting the required surveys.

32. On August 2, 1999, in Oregon Natural Resources Council Action v. U.S. Forest Service and Bureau of Land Management, 59 F. Supp. 2d 1085 (No. C98-942WD), Judge Dwyer of the United States District Court for the Western District of Washington agreed with these

plaintiffs, finding that the Forest Service had acted arbitrarily and capriciously and not in accordance with the law by authorizing timber sales based on memoranda that unlawfully exempted the sale areas from the required surveys.

33. The District Court granted summary judgment against the Forest Service. Based on this ruling, the Forest Service immediately suspended certain timber sales identified in the amended complaint. One of the sales so suspended was the Clark timber sale.

34. In the fall of 1999, the United States District Court also ordered the environmental plaintiffs, the Forest Service, and the BLM to engage in settlement negotiations concerning the scope and duration of the court's injunction.

35. On November 23, 1999, the environmental plaintiffs, the Forest Service, and the BLM filed a stipulation and proposed order for dismissal of the case under which the Forest Service agreed, among other things, not to lift the suspension of the Clark sale until certain survey requirements, which the Forest Service had failed to perform prior to awarding Clark, were satisfied.

36. As a result of the foregoing agreement, the Forest Service refused to permit any operations on the Clark sale until it finally managed to comply with the Northwest Forest Plan. In particular, the operating schedule that Zip-O proposed for 2001 was rejected by the Forest Service, and even when Zip-O and the Forest Service met in 2002 after the Forest Service

had completed two Supplemental Information Reports ("SIRS"), the Forest Service indicated that it would not permit Zip-O to harvest the sale as originally awarded; instead, it sought Zip-O's agreement to make major changes as stated in the SIRS.

37. By letter of July 28, 2003, Zip-O contacted the Forest Service and indicated that it desired to harvest timber on whatever unit(s) were available for harvest. The Forest Service responded on July 30, 2003 reiterating that no operation would be permitted until Zip-O agreed to a modification proposed by the Forest Service.

38. The Forest Service's suspension of performance in this regard constituted a breach of its implied duties to cooperate and not to hinder Zip-O's performance, and therefore, a breach of the Clark timber sale contract.

39. In a subsequent letter dated August 11, 2003, the Forest Service advised Zip-O that the Clark sale was the subject of yet further litigation, i.e., a suit filed by ONRC Action on May 9, 2003, challenging the Forest Service's use of SIRS to cure the deficiencies found by the District Court in Oregon Natural Resources Council Action v. U.S. Forest Service and Bureau of Land Management, 59 F.Supp. 2d (No. C98-942WD) and that the Forest Service had (without contacting or even advising Zip-O) entered into a stipulation with ONRC Action on June 26, 2003 pursuant to which it agreed not to approve any operating plan or otherwise authorize any ground disturbing activities on the Clark sale before October 1, 2003.

40. Thereafter, the court issued an injunction precluding the Forest Service from permitting further logging until such time as the court determines that the Forest Service has complied with National Environmental Policy Act "(NEPA").

41. The Forest Service has yet to advise Zip-O that performance of the sale as originally bid could resume.

42. At the time of each suspension, Zip-O had deposits on the sale totaling $293,000. On October 15, 1999, this amount was reduced to $6,000.

43. At the time of the suspensions, Zip-O had a performance bond on the sale in the amount of $196,000. On May 3, 2000, this amount was reduced to $9,800.

44. As a result of each of the suspensions, Zip-O could not provide as much timber to its mill as it otherwise would have, and therefore, the mill did not produce as much finished product as it would have. As a result, all of the fixed and semi-fixed costs of operating the mill were not amortized.

45. The cost of direct labor (including burden) at the mill during FYE March 2000 totaled $1,758,033 and would have been sufficient to produce the 26,127 MBM of lumber. However, as a result of the suspension, only 21,896 MBM was produced in FYE March 2000 with this amount of direct labor.

46. As a direct result of the suspension, Zip-O did not have the profits that it would have made on the sale and in turn could not reduce its outstanding debt. Therefore, it incurred additional interest costs of $284,238.71 through November 15, 2003.

47. Of the $368,870.46 in purchaser road credits that Zip-O had earned on the sale in 1998, it applied portions to cover its downpayment on the sale, and was allowed to transfer other portions to pay for stumpage on other sales. Zip-O was not, however, allowed to transfer the remaining $210,956 on the basis that, although not indicated in the prospectus or the sample contract, this sale is one containing timber owned by the Forest Service (to which the 16 U.S.C. § 535, permitting transfer applies) and timber owned by BLM (which the 16 U.S.C. § 535, does not apply). Since Zip-O was not permitted to transfer the credit it earned, due to the suspension of the sale, it incurred and continues to incur substantial damages.

48. For the reasons set forth above, Zip-O believes that it is entitled to $2,155,645.62.

49. On December 1, 2003, Zip-O submitted a properly certified claim to the Contracting Officer pursuant to the Contract Disputes Act seeking damages in the amount of $2,155,645.62 and requesting a final decision within 60 days.

50. On December 5, 2003, the Contracting Officer submitted a response stating that Zip-O could expect a decision no later than January 31, 2004.

51. On January 21, 2004, the Contracting Officer submitted a response extending the date Zip-O could expect a decision to no later than March 15, 2004,

52. By letter of March 12, 2004, the Contracting Officer putatively made an attempt to extend the date by which Zip-O could expect a decision to May 15, 2004.

53. On May 15, 2004, the Contracting Officer issued a final decision awarding Zip-O a total of $14,538.89 and otherwise denying Zip-O's claims.

**Count I**

54. The Forest Service's suspension of performance on the Clark timber sale on May 19, 1999 was unreasonable as to its causation and as such constituted a breach of contract.

**Count II**

55. Plaintiff restates and realleges paragraphs 1- 53.

56. Additionally and in the alternative, the Forest Service's suspension of performance on the Clark timber sale on May 19, 1999 constituted a breach of warranty

**Count III**

57. Plaintiff restates and realleges paragraphs 1 - 53.

58. Additionally and in the alternative, the Forest Service's suspension of performance on the Clark timber sale on May 19, 1999 constituted a breach of the Forest Service's implied duty to cooperate and not to hinder Zip-O's performance, and hence, a breach of contract.

**Count IV**

59. Plaintiff restates and realleges paragraphs 1 - 53.

60. Additionally and in the alternative, the Forest Service's suspension of performance on August 31, 1999 and its continuing failures to remedy pre-award environmental deficiencies constitute a breach of warranty and its implied duties to cooperate and not to hinder Zip-O's performance, and therefore, breaches of the Clark timber sale contract.

**Count V**

61. Plaintiff restates and realleges paragraphs 1 - 53.

62. Additionally, and in the alternative, the Forest Service's suspension of performance on the Clark timber sale which commenced on August 31, 1999 and continues as of the date on

which this complaint is filed is unreasonable as to its duration and as such constitutes a breach of contract.

**Count VI**

63. Plaintiff restates and realleges paragraphs 1 – 48 and 49- 53.

64. Additionally and in the alternative, the Forest Service's failure to permit Zip-O to amortize road construction costs in the manner that it reasonably contemplated constituted a breach of contract.

**WHEREFORE**, plaintiff respectfully requests that this Court:

(a) rule that the Forest Service breached the Clark timber sale contract by wrongfully suspending the Clark timber sale on May 19, 1999;

(b) rule that the Forest Service's suspension of performance on August 31, 1999 and its continuing failures to remedy pre-award environmental deficiencies constitute a breach of warranty and its implied duties to cooperate and not to hinder Zip-O's performance, and therefore, breaches the Clark timber sale contract;

(c) rule that the Forest Service's suspension of performance on the Clark timber sale which commenced on August 31, 1999 and continues as of the date on which this complaint is

filed, is unreasonable as to its duration and as such constitutes a breach of contract.

(d) rule that the Forest Service's failure to permit Zip-O to amortize road construction costs in the manner that it reasonably contemplated constituted a breach of contract.

(e) overturn the Contracting Officer's denial of plaintiff's claim;

(f) award plaintiff all the damages it has suffered as a result of the Forest Service's wrongful suspensions of the Clark timber sale, plus applicable interest in accordance with the Contract Disputes Act;

(g) award plaintiff its costs and attorneys' fees incurred in pursuing this action; and

(h) grant plaintiff such further relief as this Court deems just and proper.

Respectfully submitted,

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140
(202) 775-8217 (facsimile)
Counsel for Plaintiff

OF COUNSEL:

Gary G. Stevens
Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: July 7, 2004